UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------- X

JARVIS BUCKMAN,

                Plaintiff,

  - against -

CALYON SECURITIES (USA) INC. and
CALYON – NEW YORK BRANCH,

          Defendants.

------------------------------------------------- X

**OPINION AND ORDER**

**09 CIV 6566 (SAS)**

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____14_____
DATE FILED: 9/13/11

SHIRA A. SCHEINDLIN, U.S.D.J.:

## I.   INTRODUCTION

      Jarvis Buckman brings this action against Calyon Securities (USA)

Inc. ("CSI") and Calyon – New York Branch (collectively, "Calyon") alleging (1)

race and national origin discrimination under Title VII of the Civil Rights Act of

1964 ("Title VII") and the New York City Human Rights Law ("NYCHRL"); (2)

retaliation under Title VII and the NYCHRL; (3) breach of contract; (4) fraudulent

inducement; (5) unjust enrichment; and (6) violation of section 193 of the New

York Labor Law.  Buckman's claims essentially fall into two categories:  (1) that

Calyon terminated his employment due to his race (African-American) and

national origin (non-French) and (2) that Calyon promised him a seven-figure

-1-

bonus if he met certain sales targets.

Calyon now moves for summary judgment on all claims pursuant to Rule 56 of the Federal Rules of Civil Procedure arguing that (1) Buckman was terminated as part of a reduction in force and there is no evidence permitting a reasonable inference that Calyon terminated him for a discriminatory reason; and (2) a written policy stating that bonuses are discretionary bars any attempt to enforce an alleged oral promise to Buckman for a seven-figure bonus.  For the reasons discussed below, Calyon's motion for summary judgment is granted in its entirety.

## II.   BACKGROUND

Buckman is a 31-year old African-American male.[1]  Calyon is a corporate and investment bank, organized under the laws of France, and has headquarters in Paris, capital markets business activities centered in London, and offices in other locations including New York.[2]  During all relevant times, CSI was a New York corporation and a registered U.S. broker-dealer.[3]

---

[1]      *See* Plaintiff's Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment ("Opp. Mem.") at 1.

[2]      *See* Local Rule 56.1 Statement of Undisputed Facts by Defendants Calyon Securities (USA) Inc. and Calyon – New York Branch ("Def. 56.1") ¶¶ 8-9.

[3]      *See id.* ¶ 6.

### A.      Buckman's Background and CSI's Recruitment

After Buckman received a dual degree in Economics and Industrial Engineering from Columbia College in 2003, he was an analyst in JPMorgan Chase & Co.'s credit hybrids structuring team for two years.[4]  In 2006, Buckman joined Société Générale ("SocGen") as a Vice President in the structured asset sales group,[5] where he marketed a variety of structured credit products.[6]  In November 2006, a headhunter, Dean Han, approached Buckman concerning a structured credit sales position at CSI.[7]  As a result, Buckman spoke with the following CSI employees:  Bertand Delaunay, the U.S. Head of Structured Credit Sales; Zain Abdullah, the U.S. Head of Credit Markets and Collateralized Debt Obligations ("CDOs"); and a few members of the New York structured credit team.[8]  Delaunay and Buckman discussed Buckman's concern that he would lose his 2006 SocGen bonus if he joined CSI.  To assuage that concern, Delaunay offered Buckman a guaranteed $275,000 bonus for 2006 if Buckman lost his 2006

---

[4]      *See* 12/16/10 Deposition of Jarvis Buckman ("Buckman Tr."), Exs. C, D, E to 5/27/11 Affirmation of Bernard Weinreb, counsel to plaintiff ("Weinreb Aff."), at 20, 26-29.

[5]      *See id.* at 35:9-36:13.

[6]      *See id.* at 38:11-40:9.

[7]      *See* Def. 56.1 ¶ 24.

[8]      *See id.* ¶¶ 28-30.

SocGen bonus.[9]  Buckman also alleges that Delaunay made an oral promise that Buckman would receive a "seven-figure bonus" for 2007 if he (Buckman) generated $15 to $20 million in sales revenue; however, Delaunay does not recall such a discussion.[10]

On January 11, 2007, Buckman received an offer letter from CSI for the position of Vice President.[11]  Buckman requested several changes to the offer letter – and Calyon accepted several of those changes – but no version of the offer letter included any reference to a "seven-figure bonus."[12]  Buckman testified that the letter did not mention the seven-figure bonus because the necessary approvals to get such a promise in writing could take up to a month, and CSI needed him to start immediately.[13]  Buckman's claim that he was promised a seven-figure bonus

---

[9]      *See id.* ¶¶ 32-33, 37.

[10]      *See* 5/18/11 Affidavit of Jarvis Buckman ("Buckman Aff.") ¶ 6; 1/21/11 Deposition of Bertrand Delaunay ("Delaunay Tr."), Ex. F to Weinreb Aff., at 50:4-8. To the extent there are factual disputes, I "'construe the facts in the light most favorable'" to Buckman.  *See Brod v. Omya, Inc.*, – F.3d –, No. 09 Civ. 4551, 2011 WL 2750916, at *7 (2d Cir. July 18, 2011) (quoting *Williams v. R.H. Donnelley, Corp.*, 368 F.3d 123, 126 (2d Cir. 2004)).

[11]      *See* Def. 56.1 ¶ 36.

[12]      *See id.* ¶¶ 38-39, 41-42; 4/20/11 Declaration of Donna Hayes, Senior Human Resources Generalist at CSI ("Hayes Decl.") ¶ 9.

[13]      *See* Buckman Tr. at 80:23-84:25.

rests on his recollection of oral promises made by Delaunay and Abdullah.[14] Specifically, Buckman told Abdullah that he "anticipate[d] making a million dollars in 2007 [at SocGen] dot, dot, dot," and Abdullah replied "not a problem."[15] Buckman's headhunter did not recall any promise of a seven-figure bonus.[16]

Buckman also alleges that several other representations Calyon made during the recruitment process were false. *First*, Buckman alleges that, despite representations he would have established accounts to work on, Delaunay later told Buckman that he (Buckman) would need to build new relationships or energize relationships with which others were failing.[17] *Second*, Buckman learned that Calyon was struggling financially despite prior contrary representations by Delaunay and Abdullah.[18] *Third*, Calyon's trading book of cash and synthetic products was not well balanced – it had a large amount of unsold CDO bonds that were losing value – contrary to prior representations by Delaunay and Abdullah.[19] *Fourth*, Delaunay and Abdullah represented that Calyon had "robust risk

---

[14]     *See* Def. 56.1 ¶ 47.

[15]     *Id.* ¶ 50.

[16]     *See id.* ¶ 51.

[17]     *See* Buckman Aff. ¶ 10.

[18]     *See id.* ¶¶ 11-12.

[19]     *See id.* ¶ 11.

management processes"; however, this was not the case.[20]

Buckman began work at CSI on January 25, 2007.  On his first day, he signed a document stating that he would review and comply with the Calyon Employee Handbook ("Handbook").[21]  It is disputed which of two versions of the Handbook Buckman received.[22]  Both versions provided that "[m]anagement . . . may, in its discretion, grant a bonus to any or all of its employees . . . .  Payment of a bonus is not guaranteed; management may choose to grant or not grant a bonus at year-end to any or all of its employees."[23]  It is disputed whether the version of the Handbook Buckman received stated that "[n]o one is authorized to change the employee's at-will status or to make any promises of compensation or bonus, unless such a promise is contained in a written agreement signed by an authorized representative."[24]

## B. Buckman's Colleagues

Buckman worked with four other salespersons in structured credit at

---

[20]   *Id.* ¶ 15.

[21]   Def. 56.1 ¶ 54.

[22]   *See id.* ¶ 57; Plaintiff's Response to Defendants' Rule 56.1 Statement ("Pl. 56.1") ¶ 57.

[23]   Def. 56.1 ¶¶ 54-55.

[24]   *See id.* ¶ 57; Pl. 56.1 ¶ 57.

CSI in New York – Aseem Srivastava, Bruce Mulder, Carl Schuman, and Delaunay.[25]  In July 2007, Buckman requested that CSI hire a trader for the index tranche business, and CSI hired David Galludec, who is Caucasian and French.[26] In November 2007, David Perry was moved to sales.  After Buckman told Delaunay that he (Buckman) thought that Perry was a poor performer, Delaunay allegedly responded "but he does look the part right? . . .  Well, he's white.  And a lot of our clients are white, so at least he has that working for him."[27]

Throughout Buckman's time at CSI, he repeatedly complained about the behavior of two French traders located in London – Marc Benamran and Sebastien Boucard.[28]  Buckman attributes Benamran's and Boucard's treatment of him to race and national origin discrimination because "they had no other basis" and "the only reason I could come up with is that I was so conspicuously different from them."[29]  Buckman alleges that Abdullah used the word "discrimination" in reference to the treatment of Benamran and Bouchard.[30]  Specifically, Buckman

---

[25]     *See* Def. 56.1 ¶ 59.

[26]     *See id.* ¶¶ 69-70.

[27]     *See* Buckman Tr. at 306:16-307:3.

[28]     *See* Def. 56.1 ¶ 79.

[29]     *Id.* ¶¶ 80-81.

[30]     Buckman Aff. ¶ 32.

complained that Benamran and Bouchard (1) sent messages in French in a Bloomberg chat room and did not switch immediately to English when Buckman requested they do so; (2) permitted an intern to act "very disrespectful[ly]" to Buckman; and (3) prevented the intern from writing trade tickets for New York transactions.[31]

Towards the end of 2007, Buckman also had a dispute with David Eline in which each complained to Delaunay that the other was attempting to poach clients.[32] On January 25, 2008, Delaunay attempted to resolve the dispute by having Buckman and Eline work as a team and split sales credit for accounts they both covered.[33]

### C.    Buckman's Prohibited Transaction

On January 8, 2008, Buckman executed a transaction with a counterparty, Swiss Re Financial Products Corporation ("Swiss Re"). He inadvertently failed to notice that Swiss Re was on Calyon's "Do Not Trade List" and did not obtain permission for the trade.[34] Buckman may have believed the

---

[31]     *See* Def. 56.1 ¶¶ 84, 86.

[32]     *See id.* ¶ 92. Buckman denies attempting to poach Eline's clients. *See* Buckman Aff. ¶ 22.

[33]     *See* Def. 56.1 ¶ 94.

[34]     *See id.* ¶¶ 99, 101; Pl. 56.1 ¶ 99.

Swiss Re trade was permissible because Schuman had recently completed a trade involving Swiss Re after receiving permission from management.[35]  As a result of Buckman's policy violation, he signed a warning letter acknowledging that he "breach[ed] . . . Calyon's policies and procedures" and that "[a]ny further breach will lead to disciplinary action, up to [and] including the termination of . . . employment."[36]  Buckman claims that Calyon did not require Tom Goodale, a Caucasian bond salesperson in London, to sign a warning letter after a "Do Not Trade" violation.[37]

### D.    The Financial Crisis:  Bonuses and Layoffs at Calyon

As a result of the crisis in the credit markets beginning in the summer of 2007, Calyon and its affiliates lost billions of dollars in 2007 and 2008.[38]  Due to $350 million in trading losses, CSI's chief executive officer, Abdullah, and others were terminated in the fall of 2007.[39]  Despite this climate, Buckman was not worried about his job and did not contribute to Calyon's losses.[40]  Buckman

---

[35]    *See* Def. 56.1 ¶ 108.

[36]    *Id.* ¶¶ 112-113.

[37]    *See id.* ¶ 114.

[38]    *See id.* ¶¶ 121-122.

[39]    *See id.* ¶ 123.

[40]    *See* Buckman Aff. ¶¶ 28-29.

performed his job well and generated $21.9 million in revenue in 2007.[41]  During

the same year, Schuman generated $74 million and Delaunay generated $69.5

million.[42]  Buckman received a bonus of $102,848 for 2007, the highest

discretionary amount awarded to a New York structured credit employee.[43]

Srivastava produced revenue similar to Buckman and received the same bonus.[44]

Delaunay and Schuman received no bonuses for 2007.[45]

   In April 2008, Guy Laffineur, the Head of Global Credit Market

Activity, instructed Delaunay to lay off employees in New York focusing on

synthetic credit products, and specifically index tranches, because Calyon and CSI

---

[41]  *See* Def. 56.1 ¶¶ 71, 73.

[42]  *See id.* ¶¶ 74-75.  Plaintiff responded that he "does not possess
sufficient information to admit or deny th[ese] assertions."  Pl. 56.1 ¶¶ 74-75.  This
is impermissible.  Local Rule 56.1 provides that each statement of fact "will be
deemed admitted for purposes of the motion unless specifically controverted" by
the opposing party.  Local Rule 56.1(c).  Plaintiff had ample opportunity during
discovery to determine the accuracy of the relevant facts and may not now claim
that he lacks sufficient information.  *See Delphi-Delco Elecs. Sys. v. M/V Nedlloyd
Europa*, 324 F. Supp. 2d 403, 425 n.13 (S.D.N.Y. 2004).  Accordingly, 56.1
statements not explicitly denied by plaintiff are deemed admitted.  *See Stepheny v.
Brooklyn Hebrew Sch. for Special Children*, 356 F. Supp. 2d 248, 255 n.4
(E.D.N.Y. 2005).

[43]  *See* Def. 56.1 ¶ 129.

[44]  *See id.* ¶ 130.

[45]  *See id.* ¶ 131.

were exiting these businesses.[46]  As a result, Calyon discharged six employees in New York – including Buckman, Galludec, and Schuman – as well as employees in offices across Europe.[47]  Although Calyon asserts that it stopped marketing index tranches, Buckman claims that Benamran and Boucard continued to market index tranches.[48]  Benamran and Bouchard played no role in Buckman's discharge.[49]

## III.   LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[50]  "'An issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  A fact is material if it might affect the outcome of the suit  under the governing law.'"[51]

"The moving party bears the burden of establishing the absence of any

---

[46]   *See id.* ¶¶ 135-136.

[47]   *See id.* ¶¶ 143-144.

[48]   *See id.* ¶ 146; Pl. 56.1 ¶ 146.

[49]   *See* Def. 56.1 ¶ 83.

[50]   Fed. R. Civ. P. 56(a).

[51]   *Fincher v. Depository Trust & Clearing Corp.*, 604 F.3d 712, 720 (2d Cir. 2010) (quoting *Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008)).

genuine issue of material fact."[52]  "When the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim."[53]  In turn, to defeat a motion for summary judgment, the non-moving party must raise a genuine issue of material fact.  To do so, the non-moving party "'must do more than simply show that there is some metaphysical doubt as to the material facts,'"[54] and "'may not rely on conclusory allegations or unsubstantiated speculation.'"[55]

In deciding a motion for summary judgment, a court must "'construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant.'"[56]  However, "'[c]redibility determinations, the weighing of the evidence, and the drawing of

---

[52]    *Zalaski v. City of Bridgeport Police Dep't*, 613 F.3d 336, 340 (2d Cir. 2010).

[53]    *Cordiano v. Metacon Gun Club, Inc.*, 575 F.3d 199, 204 (2d Cir. 2009).

[54]    *Brown v. Eli Lilly & Co.*, – F.3d – , No. 10 Civ. 512, 2011 WL 3625105, at *10 (2d Cir. Aug. 18, 2011) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)).

[55]    *Id.* (quoting *Federal Deposit Ins. Corp. v. Great Am. Ins. Co.*, 607 F.3d 288, 292 (2d Cir. 2010)).

[56]    *See Brod*, 2011 WL 2750916, at *7 (quoting *Williams*, 368 F.3d at 126).

legitimate inferences from the facts are jury functions, not those of a judge.'"[57]

"'The role of the court is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried.'"[58]

> "'[S]ummary judgment is appropriate even in discrimination cases, for . . . the salutary purposes of summary judgment – avoiding protracted, expensive and harassing trials – apply no less to discrimination cases than to other areas of litigation.'"[59]  Indeed, "'[i]t is now beyond cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases.'"[60]

> "Because direct evidence of an employer's discriminatory intent will rarely be found," motions for summary judgment in employment discrimination actions should be evaluated with caution.  "However, even in the discrimination context, a plaintiff must provide more than conclusory allegations of discrimination

---

[57]     *Kaytor v. Electric Boat Corp.*, 609 F.3d 537, 545 (2d Cir. 2010) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000)) (emphasis removed).

[58]     *Brod*, 2011 WL 2750916, at *7 (quoting *Wilson v. Northwestern Mut. Ins. Co.*, 625 F.3d 54, 60 (2d Cir. 2010)).

[59]     *Lu v. Chase Inv. Serv. Corp.*, 412 Fed. App'x 413, 415 (2d Cir. 2011) (quoting *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000), *superseded by statute on other grounds as stated in Ochei v. Coler/Goldwater Mem'l Hosp.*, 450 F. Supp. 2d 275, 282 (S.D.N.Y. 2006)).  *Accord Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 466 (2d Cir. 2001).

[60]     *Feingold v. New York*, 366 F.3d 138, 149 (2d Cir. 2004) (quoting *Abdu-Brisson*, 239 F.3d at 466).

to defeat a motion for summary judgment."[61]

"Courts 'must . . . carefully distinguish between evidence that allows for a reasonable inference of discrimination and evidence that gives rise to mere speculation and conjecture.'"[62]

> "[T]he plaintiff must produce not simply some evidence, but sufficient evidence to support a rational finding that the legitimate, non-discriminatory reasons proffered by the defendant were false, and that more likely than not discrimination was the real reason for the employment action . . . . To get to the jury, it is not enough . . . to disbelieve the employer; the factfinder must also believe the plaintiff's explanation of intentional discrimination."[63]

## IV.   APPLICABLE LAW

### A.   Title VII

#### 1.   Unlawful Discharge

Title VII proscribes discrimination against or termination of an

---

[61]   *Gear v. Department of Educ.*, No. 07 Civ. 11102, 2011 WL 1362093, at * 2 (S.D.N.Y. Mar. 30, 2011) (quoting *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997)).

[62]   *Fall v. New York State United Teachers*, 289 Fed. App'x 419, 420 (2d Cir. 2008) (quoting *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 448 (2d Cir. 1999)). *Accord Cameron v. Community Aid for Retarded Children, Inc.*, 335 F.3d 60, 63 (2d Cir. 2003) ("'[P]urely conclusory allegations of discrimination, absent any concrete particulars,' are insufficient" to satisfy an employee's burden on a motion for summary judgment.) (quoting *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985)).

[63]   *Tori v. Marist Coll.*, 344 Fed. App'x 697, 699 (2d Cir. 2009) (quoting *Weinstock*, 224 F.3d at 42) (original emphasis removed).

-14-

individual on the basis of "race, color, religion, sex, or national origin."[64]  "To withstand a motion for summary judgment, a discrimination plaintiff must withstand the three-part burden-shifting [analysis] laid out by *McDonnell Douglas Corp. v. Green*."[65]  "Under this framework a plaintiff must first establish a prima facie case of discrimination."[66]  To do so, a plaintiff must show that "(1) he is a member of a protected class; (2) he was qualified for the position he held; (3) he suffered an adverse employment action; and (4) the adverse action took place under circumstances giving rise to [an] inference of discrimination" based on his membership in the protected class.[67]  Title VII, however, "'does not set forth a general civility code for the American workplace.'"[68]

If the plaintiff succeeds in establishing a prima facie case, then the burden shifts to the employer to articulate a legitimate, non-discriminatory reason

---

[64]   42 U.S.C. § 2000e-2.

[65]   *McPherson v. New York City Dep't of Educ.*, 457 F.3d 211, 215 (2d Cir. 2006) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)).

[66]   *Ruiz v. County of Rockland*, 609 F.3d 486, 491 (2d Cir. 2010).

[67]   *Id.* at 492.

[68]   *McGullam v. Cedar Graphics, Inc.*, 609 F.3d 70, 76 (2d Cir. 2010) (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)). *Accord Kaytor*, 609 F.3d at 546.

for the adverse employment action.[69]  Finally, if the employer articulates a non-discriminatory reason for the challenged action, the burden shifts back to the plaintiff to demonstrate that the defendant's explanation was pretextual.[70]

Courts carefully consider whether a "stray remark" is sufficient to support a reasonable inference of discrimination because

> "the more remote and oblique the remarks are in relation to the employer's adverse action, the less they prove that the action was motivated by discrimination . . . .  The more a remark evinces a discriminatory state of mind, and the closer the remark's relation to the allegedly discriminatory behavior, the more probative that remark will be."[71]

Although no factor is determinative, courts consider

> "(1) who made the remark (i.e., a decision-maker, a supervisor, or a low-level co-worker); (2) when the remark was made in relation to the employment decision at issue; (3) the content of the remark (i.e., whether a reasonable juror could view the remark as discriminatory); and (4) the context in which the remark was made (i.e., whether it was related to the decision-making process)."[72]

### 2.    Hostile Work Environment

---

[69]     *See Ruiz*, 609 F.3d at 492.

[70]     *See id.*

[71]     *Henry v. Wyeth Pharm.*, 616 F.3d 134, 149 (2d Cir. 2010) (quoting *Tomassi v. Insignia Fin. Grp.*, 478 F.3d 111, 115 (2d Cir. 2007)), *cert. denied*, — U.S. —, 131 S. Ct. 1602 (2011).

[72]     *Id.*

An employee seeking to bring a hostile work environment claim must demonstrate the following:  (1) he is a member of a protected class; (2) he suffered unwelcome harassment; (3) he was harassed because of his membership in a protected class; and (4) the harassment was sufficiently severe or pervasive to alter the conditions of employment and create an abusive work environment.[73]

> In order to prevail on a hostile work environment claim, a plaintiff must make two showings: (1) that "the harassment was sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment" and (2) that there is a "specific basis for imputing the conduct creating the hostile work environment to the employer."[74]

Evaluating a hostile environment involves reviewing the totality of the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."[75] The question is whether a reasonable person would have found the environment to

---

[73]     *See Monterroso v. Sullivan & Cromwell, LLP*, 591 F. Supp. 2d 567, 584 (S.D.N.Y. 2008).

[74]     *Duch v. Jakubek*, 588 F.3d 757, 762 (2d Cir. 2009) (quoting *Feingold*, 366 at 149-50).

[75]     *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993).

be hostile and if the plaintiff perceived it as such.[76]  "[A] plaintiff need not show

that h[is] hostile working environment was both severe *and* pervasive; only that it

was sufficiently severe *or* sufficiently pervasive, or a sufficient combination of

these elements, to have altered h[is] working conditions."[77]

### 3.    Retaliation

"Title VII also makes it unlawful for an employer to discriminate

against an employee 'because he has opposed any practice made an unlawful

employment practice by this subchapter, or because he has made a charge . . . in an

investigation, proceeding, or hearing under this subchapter.'"[78]  To establish a

prima facie case of retaliation, the plaintiff must show: "(1) that []he participated in

an activity protected by Title VII, (2) that h[is] participation was known to h[is]

employer, (3) that h[is] employer thereafter subjected h[im] to a materially adverse

employment action, and (4) that there was a causal connection between the

protected activity and the adverse employment action."[79]  "Title VII's anti-

---

[76]    *See Mormol v. Costco Wholesale Corp.*, 364 F.3d 54, 58 (2d Cir. 2004).

[77]    *Pucino v. Verizon Wireless Commc'ns*, 618 F.3d 112, 119 (2d Cir. 2010).

[78]    *Kaytor*, 609 F.3d at 552 (quoting 42 U.S.C. § 2000e-3(a)).

[79]    *Id.*

discrimination and anti-retaliation provisions 'are not coterminous;' anti-retaliation protection is broader and 'extends beyond workplace-related or employment-related retaliatory acts and harm.'"[80]

> "Proof of causation can be shown either: (1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant."[81]

The three-step *McDonnell Douglas* burden-shifting analysis also applies to retaliation claims.[82] "At the summary judgment stage, if the plaintiff presents at least a minimal amount of evidence to support the elements of the claim, the burden of production shifts to the defendant to proffer a legitimate non-retaliatory reason for the adverse employment action."[83] "If the employer produces such evidence, the employee must, in order to avoid summary judgment, point to evidence sufficient to permit an inference that the employer's proffered non-retaliatory reason is pretextual and that retaliation was a 'substantial reason for the

---

[80]   *Hicks v. Baines*, 593 F.3d 159, 165 (2d Cir. 2010) (quoting *Burlington N. & Santa Fe Ry. Co.*, 548 U.S. at 67).

[81]   *Id.* at 170 (quoting *Gordon v. New York City Bd. of Educ.*, 232 F.3d 111, 117 (2d Cir. 2000)).

[82]   *See Kaytor*, 609 F.3d at 552.

[83]   *Id.* at 552-53.

adverse employment action.'"[84]

## B.    New York City Human Rights Law

The NYCHRL provides, in relevant part,

[i]t shall be an unlawful discriminatory practice . . . [f]or an employer or an employee or agent thereof, because of the actual or perceived age, race . . . national origin, [or] gender. . . of any person, to . . . discharge from employment such person or to discriminate against such person in compensation or in terms, conditions or privileges of employment.[85]

"City HRL claims have typically been treated as coextensive with state and federal counterparts.  However, the New York City Council has rejected such equivalence."[86]  By means of the Local Civil Rights Restoration Act of 2005 ("Restoration Act"),[87] the City Council "confirm[ed] the legislative intent to abolish 'parallelism' between the City HRL and federal and state anti-discrimination law."[88]  The city law must be construed "independently from similar

---

[84]    *Id.* at 553 (quoting *Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 173 (2d Cir. 2005)).

[85]    N.Y.C. Code § 8-107(1)(a).

[86]    *Loeffler v. Staten Island Univ. Hosp.*, 582 F.3d 268, 278 (2d Cir. 2009).

[87]    N.Y.C. Local Law No. 85 (2005).

[88]    *Loeffler*, 582 F.3d at 278.

or identical provisions of New York state or federal statutes."[89]  "Interpretations of

New York state or federal statutes with similar wording may be used to aid in

interpretation of the New York City Human Rights Law, viewing similarly worded

provisions of federal and state civil rights laws as a floor below which the City's

Human Rights law cannot fall."[90]  "'As a result of [the Restoration Act], the City

HRL now explicitly requires an independent liberal construction analysis in all

circumstances, even where state and federal civil rights laws have comparable

language.'"[91]  For both discrimination and retaliation claims under the NYCHRL,

courts apply the *McDonnell Douglas* framework.[92]

### C.    Breach of Contract

To make out a breach of contract claim under New York law,

plaintiffs must show "(1) the existence of an agreement, (2) adequate performance

of the contract by the plaintiff, (3) breach of contract by the defendant, and (4)

---

[89]    Local Law 85, § 1.

[90]    *Id.*

[91]    *Loeffler*, 582 F.3d at 278 (quoting *Williams v. New York City Hous. Auth.*, 872 N.Y.S.2d 27, 31 (1st Dep't 2009)).

[92]    *See Bernard v. J.P. Morgan Chase Bank*, No. 08 Civ. 4784, 2010 WL 423102, at *9, *15 n.6 (S.D.N.Y. Feb. 5, 2010), *aff'd*, 408 Fed. App'x 465 (2d Cir. 2011).

damages."[93]  New York courts have held that a written policy clearly stating that

bonus compensation is discretionary bars breach of contract claims based on oral

bonus promises.[94]

### D.   Fraudulent Inducement

> In order to prove fraudulent inducement under New York law, a
> plaintiff must prove "(1) that the defendant made a representation,
> (2) as to a material fact, (3) which was false, (4) and known to be
> false by the defendant, (5) that the representation was made for the
> purpose of inducing the other party to rely upon it, (6) that the
> other party rightfully did so rely, (7) in ignorance of its falsity (8)

---

[93]     *Eternity Global Master Fund v. Morgan Guar. Trust Co.*, 375 F.3d 168, 177 (2d Cir. 2004) (quotation marks omitted).

[94]     *See, e.g.*, *Hunter v. Deutsche Bank AG, N.Y. Branch*, 866 N.Y.S.2d 670, 671 (1st Dep't 2008) ("Plaintiffs' claims for breach of contract lack merit in view of the unambiguous language of their contracts and the employee handbook plainly making bonus awards solely and completely a matter of defendant's discretion."); *Smalley v. Dreyfus Corp.*, 832 N.Y.S.2d 157, 162 (1st Dep't 2007) ("It is well settled that '[a]n employee's entitlement to a bonus is governed by the terms of the employer's bonus plan.'") (quoting *Hall v. United Parcel Serv. of Am.*, 76 N.Y.2d 27, 36 (1990)), *rev'd on other grounds*, 10 N.Y.3d 55 (2008); *Kaplan v. Capital Co. of Am.*, 747 N.Y.S.2d 504, 505 (1st Dep't 2002) ("Given the clearly expressed policy of the company that bonuses were to be paid solely at the company's discretion, and the provision requiring a writing executed by specified persons on the company's behalf to alter the terms of the employment relationship, plaintiff has no sustainable claim that defendant company entered into an enforceable agreement entitling him to bonus compensation."). *But see Xu v. J.P. Morgan & Co.*, No. 01 Civ. 8686, 2003 WL 25964617, at *3 (S.D.N.Y. Sept. 24, 2003) ("[T]he Incentive Plan is not enforceable as a contract, and therefore does not preclude the existence of a separate oral [bonus] contract such as the one alleged to have been made in this case."). To the extent *Xu* conflicts with the decisions of the New York state courts on questions of New York contract law, I am bound by the decisions of the New York state courts.

to his injury."[95]

"Where a party asserts fraudulent inducement to an employment agreement, he must show:  (1) that the alleged inducing misrepresentation was collateral to the agreement; and (2) was not inconsistent with the agreement."[96] The Second Circuit has drawn a distinction between "'promissory statement[s] as to what will be done in the future,'  which give rise only to a breach of contract claim, and . . . 'false representation[s] of present fact,' which give rise to a separable claim of fraudulent inducement."[97]  Thus, an oral bonus promise potentially gives rise to a breach of contract action, not a fraudulent inducement action.[98]

---

[95]    *Computerized Radiological Servs. v. Syntex Corp.*, 786 F.2d 72, 76 (2d Cir. 1986) (quoting *Brown v. Lockwood*, 432 N.Y.S.2d 186, 193 (2d Dep't 1980)).

[96]    *Rehman v. State Univ. of N.Y. at Stony Brook*, 596 F. Supp. 2d 643, 659 (E.D.N.Y. 2009).

[97]    *Stewart v. Jackson & Nash*, 976 F.2d 86, 89 (2d Cir. 1992) (quoting *Deerfield Commc'ns Corp. v. Chesebrough-Pond's, Inc.*, 68 N.Y.2d 954, 956 (1986)).

[98]    *See Kaplan*, 747 N.Y.S.2d at 504; *Zolotar v. New York Life Ins. Co.*, 576 N.Y.S.2d 850, 854 (1st Dep't 1991) ("'[A] failure to perform promises of future acts is merely a breach of contract to be enforced by an action on the contract. A cause of action for fraud does not arise when the only fraud charged relates to a breach of contract.'") (quoting *Tesoro Petroleum Corp. v. Holborn Oil Co.*, 484 N.Y.S.2d 834, 835 (1st Dep't 1985).

[S]tatements will not form the basis of a fraud claim when they are mere "puffery" or are opinions as to future events. Nonetheless, a relatively concrete representation as to a company's future performance, if made at a time when the speaker knows that the represented level of performance cannot be achieved, may ground a claim of fraud.[99]

### E.   Unjust Enrichment

"A claimant seeking relief under a theory of unjust enrichment in New York must demonstrate '(1) that the defendant benefitted; (2) at the plaintiff's expense; and (3) that equity and good conscience require restitution.'"[100]   New York courts have refused to impose liability on a quasi-contractual theory, such as unjust enrichment, where the "plaintiff had no contractual right to a bonus and was clearly apprised of, and acknowledged in writing that he understood, the company policy that the payment of bonus compensation was purely discretionary."[101]

### F.   Section 193 of the New York Labor Law

Buckman argues that the alleged promise for a seven-figure bonus constituted 'wages' under New York law and that withholding the bonus is an impermissible deduction from wages in violation of section 193.  Section 193

---

[99]   *Cohen v. Koenig*, 25 F.3d 1168, 1172 (2d Cir. 1994).  *Accord Sheth v. New York Life Ins. Co.*, 709 N.Y.S.2d 74, 75 (1st Dep't 2000).

[100]   *Leibowitz v. Cornell Univ.*, 584 F.3d 487, 509 (2d Cir. 2009) (quoting *In re Mid-Island Hosp., Inc.*, 276 F.3d 123, 129 (2d Cir. 2002)).

[101]   *Kaplan*, 747 N.Y.S.2d at 506.

prohibits employers from making deductions from an employee's wages other than those expressly permitted.[102]  Wages are defined as "the earnings of an employee for labor or services rendered" and also include "benefits or wage supplements as defined in section one hundred ninety-eight-c of this article."[103]

Addressing the issue of which types of payments might constitute wages, the New York Court of Appeals indicated that "the statute, in expressly linking earnings to an employee's labor or services personally rendered, contemplates a more direct relationship between an employee's own performance and the compensation to which that employee is entitled."[104]  Accordingly, the nature of the disputed payment is important.  The question of whether a bonus constitutes "wages" hinges on "whether the compensation is vested and mandatory as opposed to discretionary and forfeitable."[105]  A bonus does not fall within the statutory definition of "wage" where the bonus is "entirely discretionary and subject to the non-reviewable determination of the employer."[106]

---

[102]    *See* N.Y. Labor Law § 193.

[103]    *Id.* § 190(1).

[104]    *Truelove v. Northeast Capital & Advisory, Inc.*, 95 N.Y.2d 220, 224 (2000) (noting the legislative history of § 190(1) (defining wages) generally and specifically addressing the issue of bonuses).

[105]    *Id.*

[106]    *Id.*

-25-

## V.    DISCUSSION

### A.    Title VII Claims

#### 1.    Unlawful Termination

For the purposes of this motion, Calyon concedes that Buckman satisfies the first three elements of the *McDonnell Douglas* test – (1) he is a member of a protected class; (2) he performed his job satisfactorily; and (3) he suffered an adverse employment action.[107]  However, Calyon asserts that Buckman has not offered evidence permitting a reasonable juror to conclude that Calyon terminated Buckman under circumstances giving rise to an inference of discrimination.[108]  Buckman relies on the following facts to establish an inference of discrimination – (1) Delaunay's alleged comment that Perry was a good fit for sales because "[w]ell, he's white.  And a lot of our clients are white, so at least he has that working for him,"[109] (2) Abdullah's use of the word "discrimination" in connection with the behavior of Benamran and Bouchard, and (3) Calyon's retention of only Caucasian structured credit employees.[110]  These facts are

---

[107]    *See* Defendants' Memorandum of Law in Support of Their Motion for Summary Judgment ("Def. Mem.") at 17.

[108]    *See id.*

[109]    Buckman Tr. at 306:16-307:3.

[110]    *See* Opp. Mem. at 19-20.

insufficient to survive a summary judgment challenge.

*First*, Delaunay's isolated alleged comment that Perry was a good fit for sales because he is white, although inappropriate, is not probative of whether Buckman was discharged because of his race.  The balance of the "stray remark" factors[111] weigh against considering this remark – (1) Delaunay allegedly made the comment, and although Delaunay was a supervisor, Laffineur made the decision to terminate index tranche business employees; (2) the remark was made in isolation five months before Buckman's discharge; and (3) there are no facts connecting Delaunay's comment to Buckman's discharge.  Although a reasonable juror could find that the remark itself was discriminatory, it was too remote in time and context to support a reasonable inference that Buckman's discharge was a result of race discrimination.[112]

*Second*, Abdullah's comment similarly does not support a finding that Buckman was discharged because of his race or national origin.  Buckman's recollection of Abdullah's uttering the word "discrimination" cannot be used to prove that Benamran and Boucard discriminated against Buckman.  Under the

---

[111]     *See Henry*, 616 F.3d at 149-50.

[112]     *See, e.g.*, *Dixon v. International Fed'n of Accountants*, 416 Fed. App'x 107, 110 (2d Cir. 2011) (holding that "an isolated derogatory remark" did not "create an inference of discrimination").

hearsay rule, a statement by a non-declarant may not be offered to prove the truth of the statement.[113]  Whether Abdullah thought Benamran and Boucard were discriminating against Buckman is irrelevant because even if Benamran and Boucard had discriminatory feelings against Buckman, they played no part in his termination.[114]  Thus, Buckman fails to connect any supposed discrimination by Benamran and Boucard to his (Buckman's) termination.

*Third*, Buckman's allegations concerning the race and national origin of terminated (and remaining) employees also fails to raise a reasonable inference of discrimination.  Buckman states that "all the structured credit employees who were laid off, except for one, were not French."[115]  However, the French employee laid off was the only French employee in Buckman's small group; Calyon could not have laid off more French employees in Buckman's group.  In addition, Buckman argues that "all of the structured credit employees who were retained by Defendants were white."[116]  At the time, Buckman was the only non-Caucasian employee in his group.  Although this fact is not a testament to diversity at Calyon,

---

[113]    *See* Fed. R. Evid. 802.

[114]    *See Henry*, 616 F.3d at 149-50.

[115]    Opp. Mem. at 20.

[116]    *Id.*

the retention of only Caucasian employees is not indicative of any trend, other than the termination of Buckman himself, as well as two other Caucasian employees.

Buckman has failed to satisfy his burden on summary judgment – to offer evidence crossing the line beyond "mere speculation and conjecture."[117] Buckman can only point to a stray remark, hearsay, and a distorted view of the impact of the April 2008 reduction in force on protected groups.  Accordingly, Buckman's race and national origin discrimination claims based on his termination fail.

### 2.    Hostile Work Environment

Buckman points to several facts, in addition to those previously mentioned, in support of his claim that he was subjected to a hostile work environment – (1) management singled him out for punishment in relation to the Swiss Re transaction; (2) Delaunay forced Buckman to work with Eline after Eline attempted to poach Buckman's clients; and (3) Benamran and Boucard treated him (Buckman) with hostility.[118]  Although some Calyon employees may not have shown the highest degree of professionalism in their conduct towards Buckman, Title VII "'does not set forth a general civility code for the American

---

[117]    *Fall*, 289 Fed. App'x at 420 (quoting *Bickerstaff*, 196 F.3d at 448).

[118]    *See* Opp. Mem. at 21.

workplace.'"[119]  Buckman has failed to present evidence such that a reasonable

juror could conclude that Buckman was subject to a hostile work environment.

*First*, Buckman's reprimand for the Swiss Re trade is not indicative of

a hostile work environment.  Buckman had an obligation to ensure that

counterparties were not on the "Do Not Trade" list.  He failed to do so.[120]

Although Buckman claims that a Caucasian trader in London was not required to

sign a warning letter after a do-not-trade violation, Buckman offers no evidence to

support an inference that this distinction was a result of race discrimination rather

than differing Human Resources policies in London and New York.[121]  Mere

speculation is insufficient to survive a summary judgment motion.[122]

*Second*, Delaunay's decision to have Buckman and Eline split sales

proceeds is also not indicative of a hostile work environment.  People must

occasionally share credit for accomplishments they believe are their own – this

does not give rise to a hostile work environment cause of action under Title VII.

Buckman has failed to offer evidence showing that the split sales arrangement was

---

[119]     *McGullam*, 609 F.3d at 76 (quoting *Burlington N. & Santa Fe Ry. Co.*, 548 U.S. at 68).

[120]     *See* Def. 56.1 ¶¶ 99-100.

[121]     *See id.* ¶¶ 114-116; Pl. 56.1 ¶¶ 114-116.

[122]     *See Brown*, 2011 WL 3625105, at *10.

due to his race or national origin or that the arrangement interfered with his work performance.[123]

        *Third*, the slights of Benamran and Boucard are insufficient to sustain a hostile work environment claim.  The alleged conduct – writing messages in a Bloomberg chat room in their native French language, which Buckman could not understand; permitting a London intern to act disrespectfully to Buckman and not write trade tickets for him; and generally not acting "in a civil way" towards Buckman – consists of  "offensive utterance[s]"[124] and uncivil treatment,[125] neither of which creates a hostile work environment.

        In sum, the totality of the circumstances indicate that while Buckman may have faced petty slights, there is no evidence of "severe or pervasive" behavior that altered the conditions of Buckman's employment.[126]  Accordingly, Buckman's hostile work environment claim fails as a matter of law.

### 3. Retaliation

Buckman's Opposition Memorandum contains no arguments in

---

[123]    *See Harris*, 510 U.S. at 23.

[124]    *Id.*

[125]    *See McGullam*, 609 F.3d at 76.

[126]    *See Monterroso*, 591 F. Supp. 2d at 584.

support of his retaliation claim.  Presumably, Buckman bases his retaliation claims

on a July 17, 2007 meeting with Abdullah, Spitz, and Delaunay where Buckman

complained about "the antagonistic behavior" of Benamran and Boucard.[127]

Buckman testified that he told his managers "I'm not French enough or something

like that, something to basically let them know that I feel like I am being put to the

outside because I'm not like these guys, you know, on the face."[128]

       Regardless of whether Buckman is able to establish that his complaint

to Abdullah, Spitz, and Delaunay constituted a protected activity under Title VII,

Buckman has failed to establish any causal connection between his complaint

about Benamran and Boucard and his discharge.  The lapse of nine months

between Buckman's complaint and his termination is far longer than courts in this

Circuit have permitted to infer a causal relationship.[129]  Moreover, Buckman has

pointed to no facts that would permit a reasonable juror to infer that Buckman was

discharged as a result of his complaints about Benamran and Boucard.  To the

---

[127]    Buckman Tr. at 188:7-11.

[128]    *Id.* at 188:22-189:2.

[129]    *See, e.g.*, *Ruhling v. Tribune Co.*, No. 04 Civ. 2430, 2007 WL 28283, at *23 (E.D.N.Y. Jan. 3, 2007) ("[D]istrict courts in this Circuit have consistently held that a passage of two months between the protected activity and the adverse employment action seems to be the dividing line."); *Ponicelli v. Zurich Am. Ins. Grp.*, 16 F. Supp. 2d 414, 436 (S.D.N.Y. 1998) (two-and-a-half months).

contrary, Calyon attempted to remedy Buckman's complaints about Benamran and Boucard.[130]  Thus, Buckman's retaliation claim is unsupported by any evidence and fails as a matter of law.

> **B.    New York City Human Rights Law**

Although I must consider liability under the NYCHRL independently and under more liberal standards than Title VII, Buckman's claims under the NYCHRL must fail for the same reasons as his Title VII claims.  As discussed earlier,[131] Buckman has produced no evidence that would support a reasonable inference that his termination was a result of race or national-origin discrimination. Nor is there any permissible evidence to support Buckman's claim that his termination was a result of unlawful retaliation or that he was subjected to a hostile work environment.  Buckman has not made any argument why his NYCHRL claims should survive.  Thus, even under the more liberal standard of the NYCHRL, Buckman has not supported his discrimination claims with any evidence that can defeat a summary judgment motion.[132]

---

[130]    *See* Buckman Tr. at 188:3-9.  Although there is a dispute whether management's efforts to resolve Buckman's complaints about Benamran and Boucard were successful, Abdullah did attempt to address the dispute.  *See* Def. 56.1 ¶ 82; Pl. 56.1 ¶ 82.

[131]    *See supra* Part V.A.

[132]    *See Bernard*, 2010 WL 423102, at *9.

## C.    Breach of Contract

Buckman claims that Calyon owes him a seven-figure bonus due to representations made by Delaunay and Abdullah during the recruitment process. Buckman argues that the alleged promise is enforceable, despite the discretionary bonus policy in the Handbook, because "the promise of a specific bonus in not inconsistent with the provision that management may generally, but is not required to, pay bonuses."[133]

New York state courts have consistently held that a written discretionary bonus policy bars an action for an alleged oral bonus promise.[134] Here, Buckman signed a form acknowledging that he would review and comply with the Handbook, which contained the discretionary bonus policy.[135]  Although there is a dispute as to whether the Handbook contained language stating that the policy could only be modified in writing by an authorized official, Buckman concedes that there was no promise for a seven-figure bonus in his written offer letter because it would take a month to get the necessary approvals.[136]  Thus,

---

[133]    Opp. Mem. at 12.

[134]    *See, e.g.*, *Hunter*, 866 N.Y.S.2d at 671; *Smalley*, 832 N.Y.S.2d at 162; *Kaplan*, 747 N.Y.S.2d at 505.

[135]    *See* Def. 56.1 ¶¶ 54-55.

[136]    *See id.* ¶ 42.

Buckman was on notice that management had not approved a seven-figure bonus for him, regardless of whatever assurances Delaunay and Abdullah allegedly gave.

Where there is a written discretionary bonus policy and the employee is aware that representatives do not have the authority to modify that policy orally, a breach of contract claim for breach of an alleged oral bonus agreement must fail under New York law.[137]  Accordingly, summary judgment is granted for Calyon on Buckman's breach of contract claim.

### D.     Fraudulent Inducement

In addition to the promise of a seven-figure bonus, Buckman alleges that several other representations made to him when Calyon recruited him were false – (1) Buckman would have established accounts to work on; (2) Calyon was financially sound; (3) Calyon's trading book of cash and synthetic products was well balanced; and (4) Calyon had sound risk management processes.  However, the plaintiff's arguments on fraudulent inducement focused solely on the promise of the seven-figure bonus.[138]

Because Buckman's breach of contract claim has failed, so too must

---

[137]     *See Hunter*, 866 N.Y.S.2d at 671; *Smalley*, 832 N.Y.S.2d at 162; *Kaplan*, 747 N.Y.S.2d at 505.

[138]     *See* Def. Mem. at 13-14; Opp. Mem. at 18-19; Defendants' Reply Memorandum of Law in Further Support of Their Motion for Summary Judgment at 1-7.

his claim of fraudulent inducement based on the alleged promise of a seven-figure bonus. Buckman cannot use a fraudulent inducement theory to recover on a barred breach of contract action.[139] Likewise, Buckman offers no evidence to support a fraudulent inducement action on the other grounds listed above. Statements that Calyon was financially sound, had a balanced trading book, and had sound risk management processes are not "concrete representation" about the company's performance, but rather "puffery" insufficiently concrete to induce reasonable reliance as a matter of law.[140] Finally, the alleged promise that Buckman would have established accounts to work on cannot sustain the fraudulent inducement claim. A promise for something to be done in the future is grounds for a breach of contract action, not a fraudulent inducement action.[141] Therefore, Buckman's claim for fraudulent inducement fails as a matter of law.

### E.   Unjust Enrichment

Buckman claims that he is entitled to recover for unjust enrichment as an alternative theory for recovery of the seven-figure bonus. However, for the

---

[139]   *See Kaplan*, 747 N.Y.S.2d at 504.

[140]   *See Cohen*, 25 F.3d at 1172; *Sheth*, 709 N.Y.S.2d at 75 (dismissing fraud claims based on statements that were "conclusory and/or constitute[d] mere puffery, opinions of value or future expectations.").

[141]   *See Stewart*, 976 F.2d at 89.

reasons stated earlier,[142] Calyon retained complete discretion over whether – and for how much – to award Buckman a bonus.  Because New York courts have refused to permit litigants to use a quasi-contractual theory as a backdoor to enforce an unenforceable oral bonus promise,[143] Buckman's unjust enrichment claims fail.

### F.    Section 193 of the New York Labor Law

Finally, Buckman contends that Calyon has violated section 193 of the  New York Labor Law because the promised bonus was based on Buckman's personal productivity and therefore constitutes "wages" for purposes of section 193.[144]  However, this claim fails as well.  Because Buckman's bonus was completely discretionary and subject to a non-reviewable determination by Calyon, it does not constitute "wages" for purposes of section 193.[145]

## VI.    CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is granted in its entirety.  The Clerk of the Court is directed to close this motion

---

[142]    *See supra* Part V.C.

[143]    *See Kaplan*, 747 N.Y.S.2d at 506.

[144]    *See Truelove*, 95 N.Y.2d at 220.

[145]    *See id.* at 224.

[docket #39] and this case.

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:      New York, New York
            September 13, 2011

-38-

**- Appearances -**

**For Plaintiff:**

Bernard Weinreb, Esq.
2 Perlman Drive, Suite 301
Spring Valley, New York 10977
(845) 369-1019

Christine Ann Palmieri, Esq.
Liddle & Robinson, LLP
800 Third Avenue, 8th Floor
New York, New York 10022
(212) 687-8500

**For Defendants:**

Barbara M. Roth, Esq.
Christopher Nicholas Franciose, Esq.
Nicole Civita, Esq.
Hogan Lovells US LLP
875 Third Avenue
New York, New York 10022
(212) 918-3000